velvets, handkerchiefs, &c., to which the clause applies; and such is the proof in the case. But, if the hosiery in question comes equally within the description, I see no reason for distinguishing these goods from those above referred to, and which it is admitted fall within the section.

It is argued, also, that the addition, in the particular enumeration of the articles in schedule E of the act of 1846, of the words "made on frames," and "worn by men, women, and children," restrains the second section of the act of 1857 from an operation and effect that would comprehend any one article found in the enumeration. I think not. If the subsequent amendatory act adopts language that embraces any one or all of the articles enumerated, it must prevail, and be regarded as changing the law. The first section of the act of 1857, which reduced the rate of duty upon goods under schedule E in the act of 1846, contemplated exceptions to the general reduction of the rate, and therefore added, "with such exceptions as are hereinafter made." These exceptions are found in the next section, and the very first is the one in question, "all manufactures composed wholly of cotton, which are bleached, printed, painted, or dyed," which articles, as thus described, under whatever schedule arranged in the act of 1846, are transferred to schedule C, and subjected to a duty of twenty-four per cent. The section goes on, and in this way makes many other exceptions. The first one, as I have said, embraces, in terms, the goods in controversy.

Some question is made as it respects the powers of the secretary of the treasury, under the act of 1857, over rates of duty. I do not deem it important, in this case, to look into that question. I must say, however, that, under the fifth section of the act of 1857, I do not see that the importer is competent to institute a suit against the collector to recover an excess of duty or a penalty paid for alleged undervaluation, without having first appealed to the secretary, according to the requirements of that section, and must then bring his suit within the time limited.

In some of these cases, the goods were at first admitted at the rate of fifteen per cent. duty, and sent to the warehouse, and the duty secured according to law; and, when the goods were afterwards withdrawn, the duty was raised to the twenty-four per cent. This is supposed to be illegal. But the mistake of the collector in not charging the proper rate of duty, did not disable the government from collecting the legal rate, nor the collector from correcting his error, nor did the mistake release the importers from an obligation imposed by law; and, as the collector had the means of enforcing the payment of the legal rate, it was his duty to exact it before he parted with the goods. Even if he had parted with them without the payment of the duty, the importer would have been liable to an action by the government to recover them.

It is said that, in some of the cases, the duty of twenty-four per cent. was imposed upon a small quantity of hosiery which was unbleached. If this be so, the collector must return the excess, under the arrangement by the counsel. In looking through the several cases, however, I find that the only appeals to the secretary were in cases of hosiery bleached; and I infer, therefore, that no question was made in respect to the unbleached articles.

## Case No. 11,677.

### In re REIN.

[8 Ben. 188.] [1]

District Court, S. D. New York. July, 1875.

TAXING MARSHAL'S FEES—POWER OF STANDING AUDITOR.

A marshal's bill of costs had been taxed by the standing auditor of the court, and the register was applied to to countersign the assignee's check for its payment, which he declined to do: Held, that the standing auditor had no power to tax the bill, and the taxation must go for nothing.

[In the matter of Philip Rein, a bankrupt.]

The register in this case certified to the court that he had been applied to, to countersign the assignee's check for the payment of the marshal's bill of costs, which had been taxed by the standing auditor, on April 5th, 1875, and that he had declined to countersign the check, being of the opinion that the auditor had no power to tax the bill.

BLATCHFORD, District Judge. I concur in opinion with the register, that the standing auditor had no jurisdiction to tax this bill. The taxation, therefore, must go for nothing.

[For subsequent proceedings in this litigation, see Case No. 11,678.]

## Case No. 11,678.

### In re REIN.

[8 Ben. 384; [1] 13 N. B. R. 551.]

District Court, S. D. New York. Feb., 1876.

BANKRUPTCY — MARSHAL'S COSTS — TAXATION — CONSENT OF ASSIGNEE.

The marshal filed with the clerk for taxation a statement of his fees under general order No. 30, amounting to $441.35, accompanied by an affidavit of a deputy marshal that the services charged for were performed and the expenses charged were paid and were just and warrantable. The assignee in bankruptcy had notice and consented in writing that the bill be taxed at $391.50, and the clerk taxed it at that amount. The assignee drew a cheque in favor

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]